# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **J.S., a minor, by and with her parents, ALBERTO SOLORIO and ALICIA SOLORIO,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CLOVIS UNIFIED SCHOOL DISTRICT,**<br><br>**Defendant.** | **1:16-cv-01319-LJO-BAM**<br><br>**MEMORANDUM DECISION AND ORDER AFFIRMING THE ALJ'S SEPTEMBER 1, 2016, DECISION**<br><br>**(Doc. 7)** |

## INTRODUCTION

This appeal concerns an Administrative Due Process Hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  Student J.S. ("Student") brought this action by and with her parents, Alberto Solorio and Alicia Solorio, seeking to reverse a decision of the California Office of Administrative Hearings ("OAH").  The decision found that Defendant Clovis Unified School District's ("the District") proposed individualized education program ("IEP"), as amended on April 18, 2016, offered Student a Free and Appropriate Public Education ("FAPE") in the least restrictive environment ("LRE") pursuant to the IDEA.  (*See* Administrative Record ("AR") 616-48).  Student seeks reversal of the OAH decision, as well as damages and attorney's fees and costs. (Doc. 1.)

1

# I. FACTUAL BACKGROUND

In March 2016, Student was a 14-year old girl attending seventh grade at Kastner Middle School within the Clovis Unified School District.  Student qualifies for special education under the category of intellectual disability due to Down syndrome, and Student has been included in the general education program since Kindergarten, with resource specialist program ("RSP") support.  Her educational program for seventh grade consisted of one elective, lunches, breaks, and physical education in general education, history and science in general education, and math and language arts in an RSP classroom.  She has always had a one-to-one instructional aide.

## A.     IEP Team Meetings

On March 16, 2016, Student's IEP team met to develop Student's annual IEP for eighth grade.  (AR 249-324.)  The IEP team began by reviewing Student's progress on previous goals, noting she had met only 40 percent of her goals (6 out of 15).  (AR 249-63.)  Other than Student's mother ("Mother"), all members of the IEP team were concerned that Student was not making educational progress in the general education setting, observing Student was beginning to withdraw during her academic general education and RSP classes.  (AR 290-94; 687:5-688:23; 1092:15-1093:4; 1179:25-1182:6.)

Ms. Worden, Student's RSP instructor, explained Student put her head down in class when peers asked her questions, and Student would become frustrated and withdraw when she was questioned during instruction.  (AR 291; 919:1-920:1.)  The IEP team also considered a letter written by Ms. McLean, Student's science teacher, who observed Student had withdrawn in her science class, and her social skills had regressed.  (AR 291; 581; 1177:18-1178:20.)  Ms. Worden noted she had seen very "minimal growth over a two[-]year period and ha[d] seen some regression [in Student]."  (AR 292; 1091:8-1093:19.)  Student's grades were reviewed, which included "F" grades in both general education science and history.  (AR 267.)  Student received modifications of the academic requirements in both these general education classes to a kindergarten and first-grade level to meet her individual needs, but she was still unable to achieve a passing grade.  (AR 285, 290-92, 915:24-916:5.)

The IEP team also discussed eight new proposed goals for Student.  (AR 274-82, 293-94, 1101:1-1119:15.)  After discussing surrounding goals, inclusion, accommodations, modifications and supports for Student, and placement options, the District made its offer of a FAPE wherein Student would spend 42 percent of her time in a Special Day Class ("SDC") for academic activities with other disabled students, and 58 percent of her time in a regular classroom for extracurricular and non-academic activities.  (AR 285; 293; 1111:16-1112:5.)  Mother stated her concern that Student would not have movement from class to class in the SDC, and indicated she thought Student would do well in her general education classes if she were given additional supports.  (AR 293.)  Mother stated she would discuss the 42-percent SDC placement offer with her husband.  Mother was asked whether she would consent to any portion of the IEP – i.e., the proposed goals – but Mother refused, indicating her fear that if she agreed to the goals, it would imply that the only place those goals could be worked on was in the SDC placement.  (AR 294.)

The IEP meeting was reconvened on April 18, 2016, to address Mother's concerns and to discuss the proposed IEP and offer of placement.  (AR 295-324; 1133:1-1138:23.)  At the April meeting, the IEP team discussed Student's lack of academic and non-academic progress in the general education setting, followed by comporting revisions to and additional new goals in Student's annual IEP.  After the revisions, the offer of FAPE for the 2016-17 school year remained the same:  Student would be placed in an SDC for her academic subjects (constituting 42 percent of her time), and in the general education setting for two elective classes and physical education (constituting 58 percent of her time).  (AR 319.)  Student's parents did not agree with this offer.

**B.    The District's Request for A Due Process Hearing**

On May 27, 2016, the District requested a due process hearing before the OAH to determine whether the proposed IEP offered Student a FAPE and whether the District could implement it without Student's parents' consent.  In defending and explaining its offer in its preconference hearing statement, the District provided the following argument, in relevant part:

Student's current placement is in the general education setting for 77% of the time and in the [RSP] direct instruction setting for 23% of the time.  Due to Student's significant cognitive, adaptive, academic, and speech and language deficits, Student is unable to access the grade-level academic curriculum that is implemented in her general education and RSP classes.

In Student's academic classes, the District extensively modifies the grade-level curriculum as well as the expectations of Student's performance.  Indeed, the curriculum must be modified to such an extent that it bears little or no resemblance to the work being done by the typically-developing students in Student's classes.  Student requires ongoing and significant prompting and support by adult staff, including her one-on-one instructional assistant, on whom she is highly dependent.  Effectively, Student is a member of the general education and RSP direct instruction classes in location only as she is working on a separate curriculum with her instructional assistant.  This is not the least restrictive environment for Student, and she is receiving little educational benefit.

(AR 35-36.)

## C.    Due Process Hearing Before the OAH Administrative Law Judge ("ALJ")

A three-and-a-half day hearing was held before an ALJ beginning on July 12, 2016.  (AR 651.) Donna Iturbe (District program specialist), Kristen Belknap (District learning director), Michele Shurtliff (Student's general education history teacher), Lisa Marie Bath (District psychologist who assessed Student in 5th grade), Gabrielle Worden (District resource specialist and teaches Student's RSP class), Regena McLean (Student's general education science teacher), Dava Parks (District special education teacher), David Weber (District lead psychologist), and Lisa Herring (District assistive technology) testified on behalf of the District.  Hailee Santos (Student's friend and after-school tutor), Mother, and Patricia McVay (Student's special education expert) testified on behalf of Student.

Ms. Iturbe observed Student in several of her RSP classes, and noted Student would withdraw or shut down and disengage when the tasks were too difficult for her; she did not respond to teachers and required encouragement and cuing to get back on track; and she was very dependent on her instructional aide, requiring prompting at every step of academic assignments.  This type of withdrawal and disengagement was not observed in Student's non-academic classes.  (AR 671-847.)

Ms. Belknap observed Student primarily in her RSP language arts class, but also observed her in math class as well as at break and lunch times.  Even in her RSP classes, Student did not actively

participate in the lesson; she required prompting from her instructional aide to start her work and needed redirection back to the assignment when she was off task; and Student was reserved and quiet. Ms. Belknap testified Student's engagement was different in non-academic classes, where she interacted in a causal and fun manner, appearing happy and relaxed. (AR 847-904.)

Ms. Shurtliff testified Student was unable to keep up with the general education history curriculum; she could not comprehend many of the vocabulary terms or text-related questions; she was unable to engage or participate with the class during instruction; she could not do any of the whole-class or group reading portions of instruction; and she was unable to start or continue her work independently. Ms. Shurtliff noted Student even struggled with her modified curriculum and would become frustrated and withdraw. Ms. Shurtliff testified the eighth grade reading criteria could not be modified to Student's instructional level. Although she had no specific training on inclusion for students with Down syndrome or with intellectual disabilities, she had support from the special education staff. (AR 904-29.)

Ms. Bath, a school psychologist, testified she observed Student in the RSP setting in 2014 while Student was in the 5th grade. At that time, Student was unable to initiate work independently and required her instructional aide to prompt her to start and continue working through each step of an assignment. In her music class, however, Student required less prompting and engaged with the class and her peers. Her impression was Student was struggling "quite a bit" with her general education academic material. (AR 939-1028.)

Ms. Worden taught Student language arts and math in the RSP setting, and observed Student in her science and history classes. In her RSP classroom, Student was unable to keep up with the modified curriculum, and Ms. Worden testified she was unable to modify her curriculum to Student's first-grade instructional level. Ms. Worden described Student as more social in her elective classes, but in her academic classes she did not initiate conversations, did not appear happy, and did not engage with peers or perform group work. In her history class, Ms. Worden observed Student would appear

uneasy coming to class, and despite prompting from the teacher and instructional aide, she often appeared frustrated or did not know what to do.  She would demonstrate her frustration by putting her head down or shrugging her shoulders.  Even in her RSP class, Ms. Worden noted Student was growing increasingly frustrated as the curriculum progressed.  (AR 1029-1159.)

Ms. McLean is Student's general education science teacher.  She testified she has experience with special needs students, including those with cognitive delays.  She observed Student was unable to understand the class material; the majority of the time Student appeared overwhelmed and as though she did not want to be in the class.  Student would place her head on her desk or look disengaged; she did not engage with the instruction; she was not independently motivated to initiate work; and she had very little comprehension of the text and materials, even though modified to her instructional level.  Ms. McLean testified she saw Student withdrawing more and more as the year progressed; she was easily embarrassed and would withdraw from questioning; and she appeared overwhelmed with the materials.  Ms. McLean explained that she was unable to modify the eighth grade curriculum to a level that Student would understand and be able to access.  (AR 1161-95.)

Dava Parks, the special education SDC teacher for the District, testified she generally has 10 to 12 students in the SDC class who function anywhere from a pre-kindergarten to a second- or third-grade level.  The goals she teaches are based on state standards, and she exposes students to their grade-level standards whenever possible.  Ms. Parks testified she paired Student with a peer mentor to assist her in elective classes during seventh grade, she observed Student 10 times per semester, and she completed Student's state assessment.  In her view, Student was difficult to keep focused, and she was often observed to be unengaged with her head on the table.  It was difficult for Student to stay on task during class.  Ms. Parks testified she had reviewed Student's proposed IEP goals for eighth grade and found them appropriate and measurable.  (AR 1209-79.)

Dr. Weber, lead psychologist for the District, testified about his observation of Student during her general education history class.  During that class, Student was able to find her seat and work with

her instructional aide who prompted her to start her work.  Student worked in a group, and another student attempted to interact with her, but she seemed to reciprocate very little.  During instruction, Student was unable to keep pace with the class; for example, although the rest of the class was listening to instruction and directions given by the teacher, Student still did not have her name on the top of the assigned worksheet.  When the class began working independently after the teacher had given the assignment directions, Student put her head on her desk and appeared uninterested in working on the assignment.  Although the aide and the teacher attempted to engage her with the assignment, Student kept her head down on her desk.  Dr. Weber's impression was Student did not understand what she was supposed to do with the assignment, despite encouragement and prompting.  Upon review of Student's proposed IEP goals, Dr. Weber testified they seemed appropriate based on Student's current level of functioning.  (AR 1472-1519.)

Ms. Herring is the District's assistive technology coordinator who testified about the technology made available to Student to access the curriculum.  An i-pad was available to Student which had several applications for visual aids, typing, spelling, and calendaring.  There were also applications for math, writing, and for identifying coins.  Bookshare was also available, which would assist in increasing textbook font and provided some audio of texts.  Student's aide was trained to access and use the i-pad applications.  Student had some difficulty learning the applications, but she was making some progress on repetitive tasks through the use of the i-pad.  Student had supplementary aids and services including high- and low-tech assistance, such as masking, access to the internet and software applications, manipulatives for math, and pairing of verbal directions with visual cues.  (AR 1358-88)

Hailee Santos, a friend and Student's former after-school tutor, testified Student was making progress in her speech abilities as Student could form longer sentences, could relate stories with more detail, and had become more outspoken.  Student talked to Ms. Santos about her friends, and it appeared she liked her teachers and all of her classes.  Ms. Santos did not tutor Student during her seventh grade school year and had not observed her at school.  (AR 1282-89.)

Mother testified Student enjoyed school, and could navigate her schedule and find her classes. Student enjoyed her homework; she liked her classes and talked about a movie she had seen in her science class about DNA.  Mother felt that even though it may appear Student was not learning, she was listening and understanding some of the academic material.  Due to vision impairment, Student requires larger font and images.  During homework, Student did not require constant prompting. Student's draft IEP in 2015 for seventh grade had proposed an SDC class, but Mother did not consent. Student was placed on a "stay put" schedule for seventh grade, and remained in general education for science and history.  During the IEP meeting in March 2016, an SDC classroom was again suggested as the placement for Student for academic subjects.  Based on Mother's observations, however, she thought Student still benefitted from an inclusive setting.  Student was motivated in her general education classes and loved science.  She felt Student was making progress on her goals, but certain modifications, such as enlarged print, were not in place all academic year, and that may have been detrimental to Student.  Mother felt the IEP team never addressed inclusion as a placement option for Student and that the teachers did not know how to properly work with Student or appropriately modify her work so she could access the curriculum in her general education classes.  Mother objected to the SDC placement as she felt students in that classroom would not model appropriate language and skills for Student.  (AR 1290-1356.)

Ms. McVay is a special education expert who reviewed Student's records and testified about Student's IEP and educational program.  Ms. McVay opined Student did not require an alternative curriculum for inclusion.  Having reviewed some of Student's modified assignments, Ms. McVay determined the work was not appropriately modified and Student's general education teachers were not properly trained in inclusive strategies for students with disabilities.  She opined Student's IEP goals should be aligned to grade-level, but the proposed IEP goals were too low and were inappropriate for Student.  To be successful in an inclusive class, she noted Student would need support from school personnel in the form of staff training, pre-teaching to Student, participation visuals, visual schedules

1   and checklists, daily home/school communications, and multi-modal instructions.  She concluded that

2   Student has not been appropriately or adequately supported in her general education classroom, and

3   that there were "things that both research based and evidenced in the IEP that have actually hampered

4   [Student] from being included."  (AR 1407-68.)

5   **D.      ALJ Finds IEP offered by District Constituted a FAPE**

6           The ALJ issued a decision on September 1, 2016, finding that the IEP offered by the District

7   was a FAPE, the proposed IEP goals were valid, and the District was entitled to implement the IEP

8   without Student's parents' consent.  Student now seeks to reverse the ALJ's determination.

9                                   **II. <u>LEGAL STANDARD</u>**

10          The IDEA provides federal funds to help state and local agencies educate children with

11  disabilities while conditioning the funds on compliance with specific goals and procedures, primarily

12  the obligation to provide a FAPE.  20 U.S.C. § 1412; *Board of Educ. of Hendrick Hudson Cent. Sch.*

13  *Dist. v. Rowley*, 458 U.S. 176, 179–80 (1982) (describing the genesis and primary provisions of IDEA).

14  Among the procedures mandated by IDEA is the development of a written IEP for each child with a

15  disability.  20 U.S.C. § 1401.  The IEP is crafted to meet the unique needs of each child with a

16  disability by a team that includes a representative of the local educational agency, the child's teacher

17  and parents, and, when appropriate, the child.  *Id.* § 1414(a)(5).  The IEP must consist of various items

18  including "a statement of the child's present levels of academic achievement and functional

19  performance," "a statement of measurable annual goals, including academic and functional goals," and

20  "a description of how the child's progress toward meeting the annual goals . . . will be measured."  *Id.* at

21  § 1414(d)(1)(A).  Local educational agencies must review, and where appropriate revise, each student's

22  IEP at least annually.  *See id.* at § 1414(d)(4)(A).

23          The IDEA also contains extensive procedural safeguards for the benefit of disabled children and

24  their parents, including the opportunity to review records, the right to be notified of any changes in

25  identification, evaluation, and placement of the student, as well as the right to file a Due Process

Complaint regarding their child's education.  20 U.S.C. § 2015(b)-(h).  Such complaints may lead to mediation or an appearance at an impartial Due Process Hearing conducted by a hearing officer.  *See id.* at § 1415(e)-(f).

Under the IDEA, "[a]ny party aggrieved by the findings and decision made [by the hearings officer] . . . shall have the right to bring a civil action with respect to the complaint presented . . . which action may be brought . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).  In these actions, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.*  The burden of persuasion is on the party challenging the administrative decision. *L.M. ex rel. Sam M. v. Capistrano Unified Sch. Dist.*, 538 F.3d 1261, 1269 (9th Cir. 2008).

Judicial review in IDEA cases "differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative records and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993). In IDEA cases, courts give "less deference than is conventional" in the review of administrative decisions. *Id.* at 1472.  This standard was articulated in *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 587-88 (9th Cir. 1992) as follows:

> The court, in recognition of the expertise of the administrative agency, must consider the findings carefully . . . After such consideration, the court is free to accept or reject the findings in part or in whole.  Thus, . . . federal courts cannot ignore the administrative findings . . . Ultimately, however, the weight to be accorded administrative findings under the IDEA is a matter within the discretion of the federal courts.

Despite this lesser deferential standard, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995); *see also Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012) ("An administrative hearing officer's 'thorough and careful' findings receive particular deference.").  After such consideration, "the court is free to accept or reject the findings in

1   whole or in part." *Gregory K v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (citation

2   omitted).  "When the court has before it all the evidence regarding the disputed issues, it makes a final

3   judgment in what is not a true summary judgment procedure [but] a bench trial based on a stipulated

4   record." *Miller v. San Mateo-Foster City Unified Sch. Dist.*, 318 F. Supp. 2d 851, 859 (N.D. Cal. 2004)

5   (internal quotation marks omitted); *see Ojai*, 4 F.3d at 1472 (such procedure is proper when the court

6   "had before it all of the [] evidence regarding the issues in dispute").

7   ### III. <u>ANALYSIS</u>

8        Student's general contention is that the placement offer made by the District did not constitute a

9   FAPE because it only allowed her access to general education classrooms for 52 percent of her day, and

10  offered her an SDC for her academic subjects comprising the other 48 percent of her day.  Student

11  maintains a FAPE should have constituted full inclusion in general education classrooms, with no time

12  spent in an SDC classroom.  In concluding the District's placement offer constituted a FAPE, Student

13  contends the ALJ erroneously failed to (1) credit the testimony of her expert witness, Ms. McVay;

14  (2) require the IEP be predicated on peer-reviewed research; (3) find the District's placement offer was

15  predetermined; (4) find that SDC was not the LRE for Student; and (5) find that Student has a right to

16  grade-level curriculum and that her IEP goals were invalid.

17  **A.    The ALJ's Determination is Entitled to Deference**

18       The ALJ's findings of fact and conclusions of law will be afforded substantial weight where the

19  OAH decision shows "careful, impartial consideration of all the evidence and demonstrates [the ALJ's]

20  sensitivity to the complexity of the issues presented."  *Ojai*, 4 F.3d at 1476.  Here, the OAH hearing

21  lasted almost four days, and the ALJ was involved in actively and frequently questioning witnesses.

22  Additionally, the ALJ's 34-page decision presents a thorough and accurate factual background and a

23  detailed analysis supporting the ALJ's ultimate conclusions.  *J.W. v. Fresno Unified Sch. Dist.*, 626

24  F.3d 431, 440-41 (9th Cir. 2010) ("a Court treat[s] a hearing officer's findings as thorough and careful

25  when the officer participates in the questioning of witnesses and writes a decision contain[ing] a

1  complete factual background as well as a discrete analysis supporting the ultimate conclusions"

2  (quoting *R.B. v Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942-43 (9th Cir. 2007))).  Accordingly,

3  the Court gives "due deference" and weight to the ALJ's findings and conclusions.

4  **B.    District's Placement Offer Constituted a FAPE**

5        Student's argument centers on whether her academic materials could have been modified to her

6  instructional level so that she could remain included in the general education classroom for academic

7  subjects and whether inclusion in the general education classroom is the least restrictive environment.

8  Ms. McVay testified the seventh and eighth grade academic materials and services could be modified to

9  Student's instructional level, and that inclusion was the best and least restrictive environment for

10  Student.

11      **1.    The ALJ Did Not Err in Discounting Ms. McVay's Opinions**

12        Student contends the ALJ improperly discredited the testimony of her expert witness, Ms.

13  Patricia McVay.  Ms. McVay opined Student could satisfactorily be taught academics in general

14  education classrooms provided her materials were properly modified to her instructional level and

15  certain supports were put into place; that she did not need an alternative curriculum; and that she had a

16  right to grade-level, standards-based curriculum.

17        The ALJ found Ms. McVay's opinions "not persuasive" primarily because they "appeared to be

18  based in a general philosophy of inclusion rather than any careful consideration of Student's individual

19  capacities and needs."  (AR 630.)  The ALJ noted Ms. McVay knew "relatively little" about Student, as

20  all her knowledge came from reading and reviewing Student's recent IEPs and "one or two assessments

21  from 2014," and Ms. McVay had a poor memory of Student's IEP.  (AR 630.)  The ALJ found Ms.

22  McVay assumed Student had capabilities she did not have and provided hypothetical examples that

23  undercut how Ms. McVay envisioned Student could function in the classroom.  (AR 630-31.)  Finally,

24  the ALJ found unpersuasive Ms. McVay's testimony that inclusion was possible for Student so long as

25  properly trained personnel modified the curriculum appropriately and additional supports were put into

1  place.  (AR 632.)  The ALJ noted Ms. McVay could not adequately articulate how the academic

2  materials could be modified to Student's instructional level, nor was she able to identify any ways in

3  which Student's teachers were improperly trained to adequately modify Student's academic materials.

4      Student first argues Ms. McVay's lack of personal contact with or observations of Student

5  should not weigh against her credibility, particularly when the District's expert, Dr. Weber – whose

6  opinion was credited – only evaluated Student for a 30 to 35 minute period, and he had never attended

7  any of Student's IEP meetings or assessed Student.  Student also argues the ALJ used irrelevant or

8  "specious" examples to support his reasoning that Ms. McVay's knowledge of Student's IEP and her

9  general education instruction were insufficient.

10      The ALJ's credibility determination regarding Ms. McVay's testimony is sound and will not be

11  disturbed:  it is based on salient examples supported by a preponderance of evidence in the record.  Ms.

12  McVay's lack of personal contact with Student was a sufficient basis, among others, for the ALJ to give

13  her testimony less weight.  Ms. McVay had never met or interviewed Student, observed Student in her

14  classes, participated in her IEP assessment or meetings, and had never talked to or interviewed any of

15  her teachers, peers, or IEP team members.  When asked to describe Student's educational program

16  based on her review of Student's records, Ms. McVay testified Student spent most of her time in the

17  back of the class with her instructional aide.  (AR 1440.)  This contradicted the testimony of Student's

18  teachers who stated she worked in groups frequently in her general education academic classes, which

19  highlighted Ms. McVay's limited knowledge of Student's actual classroom interactions and program,

20  undercutting Ms. McVay's opinions.  Student argues Ms. McVay's statement that Student worked with

21  her aide at the back of the classroom was a logical extrapolation from notations in Student's IEP and

22  assessments – it does not reflect that Ms. McVay did not have a good working knowledge of Student's

23  IEP or educational program.  However, had Ms. McVay actually spoken with Student's teachers or

24  observed Student in her classes, she would have known Student's educational program was not largely

25  spent working at the back of her general education classrooms with her aide.  Ms. McVay's less-than

1  thorough knowledge of Student's classroom interaction and educational program eroded the persuasive

2  value of Ms. McVay's opinions about Student's abilities and her educational program.

3      Student notes the ALJ rejected Ms. McVay's opinion because it was based on her "virtually

4  unqualified" belief in inclusion, but Student maintains this ground is unsupported because Ms. McVay's

5  opinion was based on extensive experience and knowledge of inclusion.   Contrary to Student's

6  argument, the ALJ thoroughly explained how Ms. McVay's opinion about inclusion was overly broad

7  and generalized:   Ms. McVay opined that no matter how cognitively challenged a student is, that

8  student can satisfactorily learn in a general education classroom with proper modifications and

9  supports.  (AR 1464-65.)  Nonetheless, the ALJ pointed out Ms. McVay did not satisfactorily explain

10  how the eighth grade general education content could be modified to Student's cognitive level:

> [Ms. McVay] referred to a lengthy document of official appearance but uncertain origin,
> describing "core content connectors," which states that it identifies the most salient
> grade-level academic content in Common Core state standards and identifies priorities in
> each content area.  Ms. McVay claimed that the document showed that eighth grade
> Common Core materials could be modified with those connectors to Student's level.
> However, the document itself does not make anything remotely like that claim, and Ms.
> McVay never explained how this could be done.

15  (AR 632.)  Coupled with Ms. McVay's demonstrated lack of personal knowledge about Student's

16  individual program and classroom interactions, her overly broad opinion of inclusion contributed to a

17  conclusion that Ms. McVay's opinions were not specific to Student or based on Student's particular

18  abilities and needs.

19      Ms. McVay's opinion about Student's ability to join the general education classroom was also

20  predicated on the assumption that Student's general education teachers did not have proper training, and

21  that their opinions the general education curriculum could not be modified to Student's instructional

22  level stemmed from their lack of training in inclusion practices.   However, Ms. McVay could not

23  identify anything in Student's IEPs to support her assertion Student's teachers lacked appropriate

24  training.  She also acknowledged on cross-examination that she had no knowledge of the District's IEP

25  process, had never talked to any of the District's service providers or teachers, and had no idea what

level of training or credentials any District personnel had or what level of collaboration occurs at the school site with special education personnel.  (AR 1466-67.)   Student had access to a resource specialist, Ms. Worden, who worked with Student on a daily basis and provided support to general education staff on how to work with Student.  (AR 911-14, 1029, 1035, 1037.)   Ms. McLean testified she had a number of students in her classes every year with different types of disabilities, including cognitive disabilities.  (AR 1167-68.)  She received support from the special education teacher on how to assist those students, and she attended staff development trainings that included strategies to meet needs of special education students.  (AR 1168-69.)  Ms. Shurtliff also testified she received assistance from special education personnel on inclusion for disabled students in her general education classes. (AR 911-12.)   Ms. McVay's lack of knowledge of teacher training and credentials or how special education personnel collaborated with general education instructors undercut her opinion that Student's teachers lacked the proper training to adequately modify Student's curriculum for her needs.

The ALJ also found Ms. McVay over-estimated Student's capabilities in light of the multiple observations of Student in her general education classrooms.  Ms. McVay testified how she envisioned Student could participate in a science general education classroom, but the ALJ found this vision was unrealistic in view of the evidence.  The ALJ noted there was nothing in the evidence to support that preteaching or the visual aids Ms. McVay envisioned would be any more effective than what Student already received.  Moreover, Ms. McVay described Student preparing for class ahead of time by reviewing the textbook, doing her own research online, and coming to class with prepared statements. However, Student's reading level was at approximately a first-grade level, and her general education teachers testified she could not understand their textbooks and lacked the necessary vocabulary to participate.   The testimony of multiple teachers, including special education professionals who personally observed student, contradicted Ms. McVay's theory on Student's ability to prepare for and focus on academic grade-level material, even the material modified to Student's instructional level.  The ALJ's reasoning in this regard is well-supported by the record.  The ALJ's consideration of Ms.

1   McVay's opinion was thorough and supported by a preponderance of evidence, and his conclusion to

2   give her opinions diminished weight was not erroneous.

3   **2.      The IEP is Not Deficient as Lacking of Peer-Reviewed Research Support**

4           Student argues the ALJ erred in finding the IEP provided a FAPE because it was not supported

5   by peer-reviewed research.  The District contends this argument has been waived because it was not

6   presented to the ALJ, and it should not be considered by the Court.  Even if the Court entertains this

7   new argument, however, the District asserts it should be rejected because there is no rigid requirement

8   that an IEP be based on peer-reviewed research.

9           Generally, when administrative proceedings such as due process hearings are available, all

10  issues must be raised at the administrative level to be subject to judicial review.  *See Portland Gen.*

11  *Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007) (excusing waiver of issues

12  not raised before administrative agency, but noting concerns of respecting "the agency's prerogative to

13  apply its expertise, to correct its own errors, and to create a record for our review").  Here, Student

14  maintains the issue of peer-reviewed research was discussed in her closing brief submitted to the ALJ

15  post-hearing and thus was not waived.  In this brief, Student noted that the IDEA requires that services

16  provided to a student must be "based on peer-reviewed research to the extent practicable." 20 U.S.C.

17  §1414(d)(I)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4).  At the conclusion of Student's argument why

18  inclusion was the most appropriate placement for her, she stated the District failed to implement

19  Student's inclusive education based on peer-reviewed special education programming, which impeded

20  Student's access to educational opportunities.  (AR 148.)  Although the words "peer-reviewed" appear

21  in these two instances in Student's closing brief, no cogent articulation was presented to the ALJ of how

22  the IEP is unsupported by peer-reviewed research.  The ALJ had specifically cautioned Student's

23  counsel at the hearing to include all arguments in her closing brief that needed to be addressed and to be

24  "very specific." (AR 1530 (ALJ explaining "it would also help me if you would be very specific about

25  your contentions.  I'm not going to go digging for arguments that aren't in your brief.  If you're not

1  going to put it in your brief, I'm not going to rule on it.  So . . . .").)  From the little that can be gleaned

2  from Student's closing brief before the ALJ, the argument has been waived.

3        Nevertheless, even if these two bare reference to peer-reviewed research were enough to

4  preserve the argument, however, it lacks substantive merit.  Student's trial brief submitted to this Court

5  discusses peer-reviewed research, but the argument is difficult to discern as it is sprinkled throughout

6  the brief in only a few sentences.[1]  Student appears to argue that Ms. McVay's opinion regarding full

7  inclusion for disabled students was supported by peer-reviewed research.  Because the proposed IEP

8  did not provide for full inclusion and none of the witnesses or the ALJ cited peer-reviewed research for

9  a placement that included time spent in SDC, the IEP was not and could not be based on peer-reviewed

10  research.

11        First, other than testifying to her experience with inclusion, Ms. McVay did not cite or reference

12  any specific peer-reviewed research supporting her opinions on full inclusion for nearly every disabled

13  student, nor was there evidence that a placement with a certain percentage of SDC was *not* a research-

14  supported placement option.  The 2004 amendment to IDEA provides than an IEP must include "a

15  statement of the special education and related services and the supplementary aids and services, based

16  on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child

17  . . . . "  Pub. L. No. 108-446, § 101, 118 Stat. 2708 (2004) (codified at 20 U.S.C. § 1414(d)(1)(A)(i)(IV)

18  (2006)).  Notably, however, there is no absolute requirement that an IEP be supported by peer-reviewed

19  research, but only that it be supported to the "extent practicable."

20

21  _____

22  [1] Student first notes that an IEP must be supported by peer-reviewed research to the extent practicable, and then summarily
concludes the District predetermined that Student would not succeed in general education and this "perception of low
expectations permeated the testimony of District's witnesses and decision of the ALJ in the hearing below."  In a different
23  section of the brief, Student again notes IEPs must be supported by peer-reviewed research to the extent practicable, and
then states neither the ALJ nor the witnesses cited to research contrary to the opinions of Ms. McVay.  Finally, Student
24  argues in conclusory fashion there was no peer-reviewed research cited in rejection of the supports and services Ms. McVay
opined were necessary for Student's full inclusion.

25

Second, even if a full-inclusion placement was the more research-supported placement option, the IEP team was not required to utilize that option if they did not find it suitable based on Student's individual needs. The U.S. Department of Education has clarified that Section 1414's peer-reviewed research preference is not absolute: "This does not mean that the service with the greatest body of research is necessarily required for a child to receive FAPE . . . the final decision about the special education and related services, and supplementary aids and services . . . must be made by the child's IEP team." 71 Fed. Reg. 46,540, 46,665 (Aug. 14, 2006). The IEP team must have this flexibility to enable it to individualize a placement for a student's particular needs, as the IDEA requires. 20 U.S.C. §§ 1401(14), 1414.

Finally, in view of the requirement for *individualized* placement plans, Student's argument is illogical. If the law absolutely required every IEP placement to be supported by research, and full-inclusion really was the most research-supported educational model for disabled students or students with Down syndrome, such students would almost never, in Ms. McVay's view,[2] be eligible or permitted to participate in special education courses like the SDC placement offered here. This is simply not the law. The law requires that an IEP be specifically individualized for a student's particular needs, and courts routinely find placements with less than full inclusion constitute a FAPE. *Rowley*, 458 U.S. at 179-80 (a FAPE requires instruction specially designed to meet the unique needs of the handicapped child, supported by services that are necessary for the child to benefit from the instruction); *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1136-38 (9th Cir. 2003) (approving interim placement of student with Down syndrome into self-contained special education classroom). Student's IEP was not deficient for lacking peer-reviewed research support, and the ALJ was not required to cite any peer-reviewed research to find the placement offer constitutes a FAPE, so long as it was particularized for Students' individual needs.

---

[2] Ms. McVay's opinion on full-inclusion was limited only to the extent a student was a danger to himself or others. Those students, she opined, may require classes separate from the general education classrooms.

### 3.     The District's Placement Offer was Not Predetermined

Student argues the proposed IEP offer constituted predetermination of placement and denied her parents the right to full participation in the placement decision.  Specifically, Student notes that the goals on the March 2016 IEP specify the special education teacher and the special education staff are the responsible persons, signifying an SDC had already been selected as the placement before the IEP meeting.  (Doc. 16, 11:6-15.)  The District contends Student's predetermination argument was not presented to the ALJ, and there is no evidence that Student's Mother was in any way prevented from participating in the IEP team meetings.

A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement.  *W.G. v. Bd. of Tr. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992).  Predetermination violates the IDEA because the Act requires that placement be based on the IEP, not the vice versa.  *Spielberg v. Henrico Cnty. Pub. Schs.*, 853 F.2d 256, 258-59 (4th Cir. 1988).   "Predetermination occurs when an educational agency determines a student's placement prior to an IEP and is unwilling to consider any other placement.  *K.D. v. Dep't of Educ.*, 665 F.3d 1110, 1123 (9th Cir. 2011).

Student's predetermination argument has been waived.  *C.L. v. Lucia Mar Unified Sch. Dist.*, No. 12-cv-9713-CAS (PJWx), 2014 WL 117339 at *10 (C.D. Cal. Jan. 9, 2014); *Robb v. Bethel Sch. Dist. #403*, 308 F.3d 1047, 1048 (9th Cir. 2002) ("when a plaintiff has alleged injuries that could be redressed by any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required").  The issue was not presented in Student's opening or closing briefs filed with the ALJ, and it was not presented as an issue at the hearing before the ALJ.  Mother testified her objection to the proposed IEP was limited to the SDC not being an appropriate placement for Student, and that Student was making progress on her goals in the general education setting.

Notwithstanding this waiver, even on its merits, Student's substantive argument fails.  Student notes the proposed IEP goals identify the special education teacher and staff as the responsible persons

which, according to Student, indicates the IEP team never adequately considered inclusion, but predetermined Student would be in the SDC class and her academic goals would be overseen by that special education teacher.   This limited notation on Student's goals is not persuasive, let alone conclusive, evidence that the SDC placement was predetermined and that the District presented it in a take-it-or-leave-it manner.  The District was entitled to give thought to the proposed IEP and placement prior to the IEP meeting, and the proposed IEP evidences this forethought – the proposal is not itself evidence of predetermination.  *See, e.g., Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992) (noting school officials must come to an IEP meeting with an "open mind" but may have given prior thought to placement).

Rather, where there is evidence that the draft IEP is a working document, that the parents are able to discuss the sections that were of concern, and that the district listened to those concerns, there is no predetermination.  *A.G. v. Hawaii*, No. 14-cv-00234-DKW-RLP, 2015 WL 3822309, at *6 (D. Hawaii June 19, 2015).  As noted above, Student's mother was welcomed and included in the IEP meeting, she articulated her concerns about a 42 percent SDC placement, which were discussed by the IEP team.   Although Student's mother testified at the hearing she recalled no discussion of full inclusion during the March 2016 IEP meeting, IEP team members testified they did discuss inclusion. Moreover, the District was not required to consider a "continuum" of placement options at the IEP meeting.  In *Basquerizo v. Garden Grove Unified School District*, 826 F.3d 1179, 1186 (9th Cir. 2016), the court noted there is no authority indicating a parent is prevented from participating in the IEP process if the school district first prepares an offer to be discussed at the IEP meeting, "instead of conducting a free-wheeling discussion and then creating an offer."   There is simply no conclusive or persuasive evidence that the draft IEP was a predetermined offer of placement by the District.

**4.     The ALJ Did Not Err in Finding the SDC was the LRE for Student**

Student argues the SDC placement offer is not the LRE because she was obtaining some educational benefit from her general education academic classes.  Specifically, Student notes she was

20

making progress on some of her IEP goals, and thus she should have been permitted to continue in the general education classrooms for her academic subjects.  Student maintains this factor, along with the lack of disruption Student poses in her general education classes, favor Student remaining in her general education classes.[3]

The IDEA favors mainstreaming disabled children in general education classes to the extent appropriate:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  "In carrying out this directive, the state educational agency must develop and implement an IEP aimed at providing each disabled child with a [FAPE] in the least restrictive environment."  *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995).  The decision to mainstream a disabled student or place that student in a special education environment is an individualized and fact-specific inquiry which requires balancing the tension between the IDEA's clear preference for mainstreaming and its requirements that schools provide individualized programs tailored to the specific needs of each disabled child. 20 U.S.C. §§ 1401, 1414(a)(5).   In *Sacramento City Union Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994), the court adopted a four-factor balancing test for determining compliance with the IDEA's mainstreaming requirement, which includes the follow:  (1) the educational benefits of placement full-time in regular classes; (2) the non-academic benefits of such placement; (3) the effect the disabled student has on the teacher and children in the regular class; and (4) the costs of mainstreaming.  These have been delineated the *Rachel H* factors.

---

[3] Student does not challenge the ALJ's finding that Student derives no non-academic benefit from her general education classes, and the cost factor is not relevant.  *See Rachel H.*, *infra*.

On the first factor, the ALJ determined Student was not receiving academic benefit from her general education curriculum.  (AR 642-43.)  Specifically, the ALJ noted Student's general education teachers testified Student could not participate in their classes, could not understand the texts, did not have the necessary vocabulary, and frequently withdrew and put her head down on her desk.  Student is also 6 to 7 years behind her classmates in academic skill.  Thus, while she made some minimal progress on her goals between 2014 and 2016 while in the general education setting, Student remains at kindergarten and first-grade level in terms of her cognitive abilities.  The ALJ found Student was not making progress with the general education curriculum, and that any progress with her individually tailored goals (which are not at grade-level) was not the result of Student's physical presence in general education classrooms, but was tied to her constant interaction with her instructional aide, the help of two private tutors, and assistance from Mother, who is educated and involved at home.  (AR 643.)

The preponderance of evidence supports the ALJ's conclusion as to the lack of benefit Student obtained from her academic general education classes.  All of Student's academic general education teachers, including in the RSP setting, observed Student almost daily, testified she could not keep up with their classes, even working on modified curriculum.  Ms. Worden testified Student could not engage in group activities (AR 1039-40); Student could not engage in the instruction in any of the classes in which Ms. Worden observed her (AR 1040-41); Student required significant support from her instructional aide, and needed continual prompts to focus on assignments (AR 1091).  Student's science teacher, Ms. McLean, testified Student could not understand class materials, was overwhelmed the majority of time, and did not engage in instruction at all.  (AR 1171.)  Even with the assistance of an instructional aide who provided step-by-step instructions and encouragement, Student was unable to complete assignments.  Ms. McLean also noted Student appeared to withdraw over the course of the year, and had a difficult time engaging with other students during group work, and was embarrassed when Ms. McLean asked her questions in a one-on-one setting.  (AR 1188.)  Ms. Shurtliff, Student's general education history teacher, testified Student was unable to access the curriculum because she

1  was academically working at a first-grade level.  Even with her aide and a modified curriculum, she

2  was unable to comprehend it and as a result she was regressing and beginning to withdraw.  (AR 1179-

3  82.)  Ms. McVay's opinion that the teachers were untrained to properly modify the curriculum had no

4  support in the record, and Ms. McVay could not sufficiently explain how the curriculum could be

5  modified to Student's instructional level.

6  The testimony discussed above constitutes a preponderance of evidence supporting the ALJ's

7  determination that Student was receiving no academic benefit in her general education classes.  The

8  only evidence of some benefit was Student's minimal progress at her first-grade and kindergarten level

9  instructional goals, which did not appear tied to her general education classes and Student had no

10  evidence of such a nexus.  The ALJ's conclusion that Student received no academic benefit from her

11  academic general education courses is underpinned by a well-reasoned and thorough analysis with

12  evidentiary support, and therefore it is given deference.

13  As to the second *Rachel H* factor, the ALJ determined that Student was not deriving substantial

14  non-academic benefit from her presence in general education, which Student does not challenge.

15  (AR 643-44.)  As to disruption to the general education classroom, the ALJ found this factor supported

16  inclusion as Student had no behavioral issues.  The final cost factor was not considered, and appears

17  irrelevant.

18  In sum, the only factor that favors Student's inclusion in academic general education classes is

19  the lack of disruption Student poses to her general education classes.  On balance, two of three of these

20  *Rachel H* factors (academic and non-academic benefit) weigh against a general education classroom as

21  the least restrictive environment.  The Court finds the ALJ did not err in finding the SDC placement for

22  Student's academic classes was the LRE.

23

24

25

**5.      Student's IEP Goals are Valid and Sufficiently Aligned with Grade-Level Standards**

Based on Ms. McVay's testimony, Student asserts the ALJ erred in finding her goals align to the state academic content standards, and contends she has a right to grade-level, standards-based curriculum.  (AR 1418.)   Ms. McVay testified the goals are written below Student's grade level, and the IEP goals should relate to the core curriculum and aligned to grade-level standards.  (AR 1428.) She also testified that with the proper accommodations and modifications for inclusion, Student should be able to engage in and follow along with eighth grade level curriculum.  (AR 1442-44.)   In considering this testimony and Student's argument that she is entitled to grade-level goals and curriculum, the ALJ provided the following discussion:

> Independent examination of the 10 goals in Clovis's proposed IEP shows that they meet these [statutory] standards.  The proposed IEP states that Student's intellectual disability affects her participation in the general education curriculum, due to her cognitive deficits, to such a degree that she requires an alternative curriculum.  The goals meet each of the educational needs the evidence showed Student has, and Student does not identify any need these goals do not address.  The IEP extensively describes her present levels of academic and functional performance in general, and then uses those levels to establish benchmarks for each of the 10 goals.  The goals extrapolated from these baselines describe advances that Student, in light of her deficits, could reasonably expect to reach in a year.  Each goal also contains a set of three short-term objectives, providing measurable intermediate steps toward the annual goals.  Each goal describes in detail how progress will be measured and who will measure it.  The goals do all of this with adequate specificity and precision, as illustrated in the Factual Findings.
> . . .
> Student's argument, that the alternative curriculum Student would have under the proposed IEP is not based on state standards, had no evidentiary support beyond the testimony of Ms. McVay; who did not claim to have any familiarity with the alternative curriculum taught in Ms. Parks's SDC.  She appeared to believe that a goal is insufficiently tied to state standards unless it explicitly references standards at the grade level of the student, no matter how far beyond the student's capabilities those standards may be.  However, while alternative curriculum must be aligned with state standards, there is no requirement that annual goals in an IEP must affirmatively demonstrate that alignment or reference those standards.
>
> In addition, the references in the goals to first grade standards impliedly incorporate eighth grade standards because, as established by Mrs. Iturbe, the standards of first grade involve concepts that are prerequisite to the standards of higher grades. First grade level standards are aligned to eighth grade standards because they contain prerequisites to the performance of the eighth grade standards, and thus promote access

24

to those standards . . . .

(AR 646-47.)

Student's argument regarding the validity of her goals was thoroughly addressed by the ALJ. Student offers no authority or reasoning why the ALJ's finding in this regard was incorrect other than a bare assertion that providing an *alternative* curriculum (as opposed to a *modified* curriculum) tailored to Student's instructional level and encompassing prerequisite skills aligned to eighth-grade standards is not permitted. Pursuant to 34 C.F.R. § 200.1(d), alternative academic achievement standards may be utilized for students with the most significant cognitive disabilities who take an alternate assessment provided those standards are aligned with the state's academic content standards, promote access to the general curriculum, and reflect professional judgment of the highest achievement standards possible. Here, Student has significant cognitive disabilities and she takes an alternative assessment; thus, the District is entitled to employ alternative academic achievement standards for Student. Student has not cited any authority that such alternative academic standards must *explicitly* reference grade-level academic content standards. And, as the ALJ noted, Student's goals are all prerequisite skills to eighth grade level academic content and therefore the goals *are* aligned to the state academic content standards, as both Ms. Worden and Ms. Iturbe testified.

Finally, as the District notes, when goals are tied to grade-level state standards without addressing the individual abilities of the student that are far below grade-level, those goals have been found not to provide a FAPE. *Jefferson v. Cnty. Bd. of Educ.*, 581 Fed. App'x 760 (11th Cir. 2014) (unpublished) (student with first-grade reading level whose reading goals were based on ninth-grade state standards did not provide a FAPE). In other words, Student would be denied a FAPE if her goals were set at eighth-grade level curriculum standards without accounting for Student's pre-primer reading level and limited cognitive abilities. The ALJ did not err in finding Student's goals valid.

**IV. <u>CONCLUSION</u>**

For the reasons set forth above, IT IS HEREBY ORDERED that the ALJ's September 1, 2016, decision is AFFIRMED in full.

IT IS SO ORDERED.

Dated:   **July 24, 2017**                     **/s/ Lawrence J. O'Neill**
                                          UNITED STATES CHIEF DISTRICT JUDGE